845 A.2d 147

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTEC-
TION/HAZARDOUS WASTE COMPLIANCE AND ENFORCE-
MENT, PETITIONER–RESPONDENT, v. MARISOL, INCORPO-
RATED, RESPONDENT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 15, 2003—Decided February 23, 2004.

Before Judges SKILLMAN, COBURN and WELLS.

*Martha N. Donovan,* argued the cause for appellant (*Norris, McLaughlin & Marcus,* attorneys; *Edward A. Hogan,* of counsel; *Ms. Donovan and Suzana D. Loncar,* on the brief).

*James T. Hill, Jr.,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General, attorney;

*Michael J. Haas,* Assistant Attorney General, of counsel; *Mr. Hill,* on the brief).

The opinion of the court was delivered by

WELLS, J.A.D.

The present appeal invites us to consider whether, after an eight-year delay in adopting regulations implementing a statutory grace period, *N.J.S.A.* 13:1D–127 to –133 (the Grace Period Law or Law), the Department of Environmental Protection (DEP) may proceed to determine that the Law does not apply to alleged violations of the Solid Waste Management Act (SWMA), *N.J.S.A.* 13:1E–1 to –207, and to impose monetary penalties. In the appeal before us, the DEP found two violations of State and Federal SWMA Regulations by Marisol, Incorporated (Marisol), to be "high priority" and penalized it $4,500 per violation, a total of $9,000. Marisol appeals only from the imposition of the penalties.

We vacate the monetary penalties concluding that the penalties violate the Law because Marisol remediated the violations immediately and DEP did not prove that those violations failed to qualify under the Law's criteria for minor violations.

I

Marisol is a fully DEP-permitted hazardous waste facility that operates a hazardous waste treatment and storage site in Middlesex. In the course of its operations, Marisol stores as many as 3,000 to 3,500 drums of hazardous waste stacked upon each other in rows separated by aisles. Marisol stacks as many as 600 to 700 drums of hazardous waste of various kinds per day. It is required by state and federal regulations implementing SWMA to label each drum with a descriptive classification code, an "S" code, developed and used internally by Marisol. *N.J.A.C.* 7:26G–12.1(a) and 40 *C.F.R.* 270.30(a). Not only are labels affixed to each drum, drums at the end of each row display the "S" code labels of the wastes contained in the drums on that row.

During the course of a routine DEP inspection of the site on December 16, 1999, an inspector noted that labels on drums, the number of which he lost count as he walked the aisles, were not visible from either side of an aisle. He did observe that the end-of-row drums bore "S" codes. The inspector asked a Marisol employee accompanying the inspection to bring to the floor five drums selected at random from the stacks whose "S" codes he could not see from an aisle. When that was done each drum bore an "S" code label. As to those drums, within a half hour or less, an office employee was able to identify the contents and generator of the waste within each drum.

On the same day the inspector also observed that Marisol was using a roll-off container to consolidate various primary hazardous wastes. He noted that the container bore no label at all to indicate what it contained or the date the waste accumulation began in violation of *N.J.A.C.* 7:26G–11.1(a) and 40 *C.F.R.* 268.50(a)(2). Marisol's project engineer testified that the roll-off container had come in that morning and told the inspector it might be empty. However, further inspection revealed that about twelve drums of waste had been co-mingled in it. He stated that roll-offs typically remained on premises between twelve to sixteen man-hours but might remain on-site empty for several days for lack of wastes to fill it. Marisol had not been previously cited for failure to label roll-offs and it did not routinely label them, tankwagons or railcars of which there were several parked on-site on the day of the inspection. The inspector was advised by Marisol employees that when the container left the facility it was placarded. Other evidence indicated that a shipping manifest described the contents of the roll-off. The engineer stated that he routinely prepared a load sheet form describing the wastes pumped into a roll-off which in this instance promptly described contents of the roll-off noticed by the inspector. A label was affixed to the roll-off within minutes.

We note that neither of these asserted violations was issued immediately. The inspector, who had not inspected Marisol's site

for a considerable period of time, decided to confer with his superiors about both of his observations. With respect to labeling the roll-off container, a question arose as to whether Marisol, which was routinely receiving wastes which it was consolidating and shipping, was required to label roll-offs in which wastes arrived for the relatively short period of time they remained on the premises. Marisol took the position that its recently modified license permitted its activities with respect to receipt, processing and prompt shipment of wastes out of its facility and argued it was not required to label roll-offs.

Nevertheless, in February 2000, Marisol was cited by DEP for violations of the above regulations for both the failure of label visibility as to the stacked drums and the absence of any label on the roll-off. Marisol appealed to DEP and requested a hearing. DEP referred the case as contested to the Office of Administrative Law which duly assigned it to an Administrative Law Judge (ALJ).

During the course of the hearing before the ALJ at which the facts above described emerged, a DEP witness, John Barry, testified to the Notice of Civil Administrative Penalties Assessment (NOCAPA) served on Marisol and to the considerations that went into the evaluation of Marisol's violations. The first consideration was the existing regulations that framed the assessment. The centerpiece of those regulations is a conduct/seriousness matrix. It is found in *N.J.A.C.* 7:26G–2.5(f), (g), (h) and (i), which provide:

(f) The Department shall assess a civil administrative penalty for violations described in this section on the basis of the seriousness of the violation and the conduct of the violator at the mid-point of the following ranges, unless adjusted pursuant to (i) below.

### SERIOUSNESS

| CONDUCT | Major | Moderate | Minor |
|---|---|---|---|
| Major | $40,000-$50,000 | $30,000-$40,000 | $15,000-$25,000 |
| Moderate | $30,000-$40,000 | $10,000-$20,000 | $ 3,000-$ 6,000 |

| Minor | $15,000-$25,000 | $ 3,000-$ 6,000 | $ 1,000-$ 2,500 |
|-------|-----------------|-----------------|-----------------|

(g) The seriousness of the violation shall be determined as major, moderate or minor as follows:

1. Major seriousness shall apply to any violation which:

(i) Has caused or has the potential to cause serious harm to human health or the environment; or

(ii) Seriously deviates from the requirements of the Act, or any rule promulgated, administrative order, permit, license or other operating authority issued, or Part A permit application filed, pursuant to the Act; serious deviation shall include, but not be limited to, those violations which are in complete contravention of the requirement, or if some of the requirement is met, which severely impair or undermine the operation or intent of the requirement;

2. Moderate seriousness shall apply to any violation which:

(i) Has caused or has the potential to cause substantial harm to human health or the environment; or

(ii) Substantially deviates from the requirements of the Act, or any rule promulgated, any administrative order, permit, license or other operating authority issued, or any Part A permit application filed, pursuant to the Act; substantial deviation shall include, but not be limited to, violations which are in substantial contravention of the requirements or which substantially impair or undermine the operation or intent of the requirement; and

3. Minor seriousness shall apply to any violation not included in (g)1 or 2 above.

(h) The conduct of the violator shall be determined as major, moderate or minor as follows:

1. Major conduct shall include any intentional, deliberate, purposeful, knowing or willful act or omission by the violator;

2. Moderate conduct shall include any unintentional but foreseeable act or omission by the violator; and

3. Minor conduct shall include any other conduct not included (h)1 or 2 above.

(i) The Department may adjust the amount determined pursuant to (f), (g) and (h) above to assess a civil administrative penalty in an amount no greater than the maximum amount nor less than the minimum amount in the range described in (f) above, on the basis of the following factors:

1. The compliance history of the violator;

2. The nature, timing and effectiveness of any measures taken by the violator to mitigate the effects of the violation for which the penalty is being assessed;

(i) Immediate implementation of measures to effectively mitigate the effects of the violation shall result in a reduction to the bottom of the range.

3. The nature, timing and effectiveness of any measures taken by the violator to prevent future similar violations;

(i) Implementation of measures that can reasonably be expected to prevent a recurrence of the same type of violation will result in a reduction equal to the bottom of the range.

4. any unusual or extraordinary costs or impacts directly or indirectly imposed on the public or the environment as a result of the violation; and/or

5. Other specific circumstances of the violator or violation.

Based on these regulations, Barry evaluated both the seriousness of Marisol's violations and the conduct from which they resulted. He stated:

Q. What does the matrix look at?

A. Two categories; one is conduct and the other was seriousness.

Q. Are you familiar with the facts in this case—violations, rather?

A. Yes, I am.

Q. I refer you to P–7, Page 5. Did you review this penalty or assessment or have any hand in it?

A. I reviewed all the penalty assessments before they go out of the office.

Q. In this particular instance what conclusions were drawn vis-à-vis the matrix on the two components that you mentioned?

A. The conduct being moderate. We used moderate because we used the violation as being unintentional but something foreseeable. It was foreseeable, something that they should have known.

In both cases, both markings and the current violation.

Q. . . . [w]hat would it have to be for something to be minor conduct?

A. The way the rule is actually written, it lists major conduct as being something that's intentional, something as being unintentional, foreseeable and minor conduct is anything less than—anything less than something being foreseeable. Maybe something that would be out of their control.

The conduct might be minor if it was totally out of their control.

Barry was asked to testify about the differences between DEP' current practices in evaluating violations and the Grace Period Law, *N.J.S.A.* 13:1D–129 to –133, upon which Marisol grounded its argument that no penalty should be assessed. He stated that he and other regulatory supervisors developed "in the mid 80s" a system which classified violations in tiers "in use today." He stated:

Q. Explain what the Department was doing.

A. We didn't call it grace period.

Q. What was it?

A. Back in the mid '80s our Bureau—the Bureau has changed. It's essentially the same group. The group that does hazardous waste regulatory, we put together an internal three-tier classification of the rules.

Q. What were they?

A. Basically they are listed as high priority, Class I violations, which we consider the most serious violations; Class [II] violations, which are less serious and then Class [III] violations, which are the least serious and we have been using it since the mid'80s until the present day.

Q. The two violations at issue today from December 16, 1999, under the classification that you have just mentioned, where would they fit?

A. I believe they were both *high priority Class I* violations.

Q. They would receive what treatment?

A. They would receive a penalty.

Q. Would they be eligible for grace period?

A. No, not at all.

Q. Either one?

A. No.

He then reviewed provisions of the Grace Period Law and testified that Marisol would not be entitled to Grace Period Law consideration because he found that Marisol's violation of those regulations were not "minor" in light of DEP practices in place since the mid–1980s. He summarized the differences between the DEP's working definition of a "minor" violation and that contained in the Grace Period Law as follows:

Does the designation of minor in the matrix correspond to the designation to minor as far as the application of grace period is concerned?

A. No, not at all.

Q. Why not?

A. For one thing our penalty rules with the matrix and category of major, moderate and minor have been around longer than the grace period rule.

Minor is not—the minor in 726G–2.5 is not the same as the minor that's considered in grace period.

Q. What would be minor violations under the Grace Period Statute?

A. Generally the—probably a—I don't know exactly what all the minor violations are, but I can probably tell you a couple of them that we have considered minor.

One would be not submitting a report on time to the Department. Other paperwork requirements the Department would have, that would pose a very minimal risk.

Q What if a manifest had a missing page or the pages were not numbered correctly?

A. Transposed numbers, not having the correct number on a manifest because the number is transposed, something like that, not submitting a copy of the manifest to the Department in a timely manner or not on time.

Q. Would it be fair to say, and I'm not trying to tell you what the answer is, markings and labelings on materials out in the facility in a general sense, do you regard those differently than the violations that you just described?

You have a hazardous waste facility. You have tanks, containers, drums, roll-offs. If those are violative of the permit such as the ones that we described today and others, would they be designated as minor or nonminor?

A. Nonminor.

We consider markings and labeling very serious and a necessary part of the whole scheme of RCRA [Resource Conservation and Recovery Act, 42 U.S.C. 6901].

The hearing before the ALJ also revealed that Marisol has an ongoing relationship with local emergency responders, especially the fire and health departments. It attends yearly meetings with local emergency response leaders and participates in "table-top" drills of hypothetical emergencies, the most common of which are fires. These drills requires that responders, report initially to Marisol's office for a briefing on what is burning. Marisol's project engineer testified that because firefighters are not be able to get close enough to burning containers, their labeling is not a key component of a measured or critical response to a fire.

Following the hearing, the ALJ found that the violations had been committed. In his written opinion, the ALJ noted the following contention by Marisol and the response thereto by DEP:

Respondent also contends that the penalties are improper and should be dismissed because the alleged violations fall squarely within the protections afforded by the Grace Period Law, N.J.S.A. 13:1D–125, et seq. Under this statute, minor violations that can be corrected within a specified time should not result in a penalty assessment, if the violation is not purposeful, if it poses minimal risk to the public health, safety and natural resources, and if it does not materially and substantially undermine or impair the goals of the regulatory program. N.J.S.A. 13:1D–129. While respondent denies that it failed to properly mark containers or that it violated labeling requirements for the consolidation of temporarily stored materials, it contends for purposes of argument that the alleged violations are minor because they satisfy the foregoing statutory requirements.

The Department disagrees with respondent's argument and cites support for its position in the testimony of John Barry, Acting Section Chief of the Department's Southern Field Office. It was his sincere and credible testimony that the Department views the label and marking violations to be high priority violations warranting a penalty. This is so because inspectors, emergency responders and anyone

else who needs to deal with a drum or container of hazardous waste must know what the material is. This is a safety and public health issue, as the contents are by definition hazardous. Thus, failure to have visible markings and proper labels undermines one of the major goals of the program, which is to protect the public health and safety.

The ALJ determined that the violations "did not qualify for Grace Period Law protection." He reasoned:

While the violations were not intentional, they did pose more than a minimal risk to the public health and safety, because the waste materials in question were hazardous. In addition, proper and visible markings and labels are an essential component of the hazardous waste regulatory scheme.

Based upon the matrix contained in *N.J.A.C.* 726G–25, the ALJ approved DEP's assessment of penalties of $4,500 per violation against Marisol.

Marisol appealed the ALJ determination to the Commissioner of the DEP. While citing at length the provisions of the Grace Period Law, the Commissioner concluded:

Prior to the adoption of rules which designate specific types or categories of violations as minor and non-minor, the Department is authorized to utilize the criteria listed in N.J.S.A. 13:1D–129 to designate that a violation is minor or non-minor, pursuant to the Statute, on a case by case basis. N.J.S.A. 13:1D–131.

Marisol's permitted activities include the processing of spent organic solvents and other hazardous wastes received from various commercial and industrial generators. Wastes are kept in both containers and drums. Respondent typically has 3,000 to 3,500 drums on site. Wastes are required to be sampled, sorted and marked with a classification code which is to be visible for inspection on each drum when stacked. Some of these hazardous wastes are reactive or flammable and must be separated.

The visibility of proper labels and markings is essential to ensure that incompatible wastes are not commingled. Emergency responders must be able to quickly identify drums and containers of hazardous waste in order to deal effectively with the contents. Further, the success of the hazardous waste regulatory program is dependent upon complete cradle to grave tracking. Failure to properly label and mark wastes also jeopardizes this component of the program.

. . . .

While the Grace Period Statute at N.J.S.A. 13:1D–133 directs the Department to adopt rules to effectuate the purpose of the legislation, it does not in any way limit the Department's authorization to act on a case by case basis until regulations are in place. Likewise, there is nothing in the case law cited by respondent which would indicate that the Department has lost its authorization in this regard. Rather, in the absence of promulgated regulations the Department may proceed, on a case by case basis, if the regulated entity is allowed to have a hearing to

challenge whether criteria has been applied in an arbitrary and capricious manner.... In the present case, Marisol was afforded a hearing with regard to the commission of the violations, assessment of penalties and application of the Grace Period Statute. [Citations omitted]

## II

The legislature adopted effective December 22, 1995 what was codified as Section VI of Chapter 1D of Title 13(Act). L. 1995, c. 296; *N.J.S.A.* 13:1D–125 to 133. The Act has been referred to as the "Grace Period Law" by the parties, the ALJ and the Commissioner. It begins with an extensive preamble, which we quote in relevant part:

The Legislature finds and declares that:

The Department of Environmental Protection has historically measured the success of its enforcement programs based upon the magnitude of penalties imposed, correlating higher penalties with greater success, and that this paradigm is predicated upon the belief that the threat or imposition of monetary sanctions is the sole economic incentive inducing compliance and the dominant force driving corporate compliance decisions and investments.

The economic dynamics of pollution control and waste management have substantially changed since the inception of environmental regulatory and enforcement programs; that considerable market forces now exist which substantially influence the economics of compliance; that the threat or imposition of monetary sanctions is no longer the dominant force driving corporate compliance decisions and investments; and that the enforcement programs administered by the Department of Environmental Protection should recognize these challenges in the factors which influence compliance.

There are equally effective alternative methods to promote compliance with environmental laws, such as establishing grace (compliance) periods, which are especially well-suited for minor violations that have minimal, if any, effect upon public health, safety or natural resources, and that the Department of Environmental Protection affords grace (compliance) periods in certain regulatory programs for minor violations of environmental laws, but this policy is not consistently applied throughout all regulatory programs.

Expanding the use of grace(compliance) periods will promote compliance by allowing those members of the regulated community who are committed to working diligently and cooperatively toward compliance, to invest private capital in pollution control equipment and other measures which will yield long-term environmental benefits, instead of in costly litigation and the payment of punitive monetary sanctions.

Establishing a policy for the consistent application of grace(compliance) periods for minor violations is a proper exercise of the Department of Environmental Protection's enforcement discretion and will enable the Department of Environmental

Protection to more sharply focus limited public resources on serious violations of environmental law.

. . .

The Department of Environmental Protection should refrain from imposing monetary sanctions for violations immediately and voluntarily disclosed, provided certain conditions are met.

[*N.J.S.A.* 13:1D–125.]

The legislation sets forth a lengthy list of the environmental laws, of which SWMA is one, to which the law applies. *N.J.S.A.* 13:1D–126. In the next section, *N.J.S.A.* 13:1D–127, in the case of minor violations, an alleged violator must to be served a notice of violation and granted a fixed date by which to remediate the violation. The Legislature requires that the Department adopt rules fixing times within which each type or category of violation could be corrected. *N.J.S.A.* 13:1D–127b.

If compliance is achieved within the time prescribed or as extended, the DEP is not permitted to impose a monetary penalty. At the same time, if compliance is not so achieved any penalty might, on a discretionary basis, be imposed retroactively to the date of the original notice. *N.J.S.A.* 13:1D–128.

Most significantly for purposes of the present case, in *N.J.S.A.* 13:1D–129, the Legislature set forth the following criteria for determining a "minor" violation:

The department shall promulgate rules and regulations designating specific types or categories of violations within each regulatory and enforcement program of each environmental law as minor violations and non-minor violations. In designating minor violations, the department shall utilize the criteria set forth in this section. All types or categories of violations not designated as minor violations shall be designated as non-minor violations.

b. A violation shall be designated by the department as a minor violation if:

(1) The violation is not the result of the purposeful, knowing, reckless or criminally negligent conduct of the person responsible for the violation;

(2) The violation poses minimal risk to the public health, safety and natural resources;

(3) The violation does not materially and substantially undermine or impair the goals of the regulatory program;

(4) The activity or condition constituting the violation has existed for less than 12 months prior to the date of discovery by the department or local government agency.

[*N.J.S.A.* 13:1D–129.]

Excluded from "minor" violations are those in which a prior violation was committed within the past year by the same violator, *N.J.S.A.* 13:1D–129b(5)(a); or, in the case of actions not involving a permit a violator has not, within the year past, been the subject of a prior enforcement action. *N.J.S.A.* 13:1D–129b(5)(b). Also excluded from the definition of a "minor" are (1) violations that are incapable of correction with the time periods fixed by DEP, *N.J.S.A.* 13:1D–129b(6); or, (2) violations that are subject to mandatory assessment of civil administrative penalties under *N.J.S.A.* 58:10A–10.1. *N.J.S.A.* 13:1D–129(c).

Self-reported violations are exempted from monetary penalties so long as the violation is abated and the violation is remedied within the timeframe designated by the DEP. *N.J.S.A.* 13:1D–130.

Finally, sections 131 and 133 of the Act provide:

*Prior to the adoption of the rules and regulations* prescribed in subsection a. of section 5 of P.L.1995, c. 296 (C. 13:1D–129), *the department* or a local governmental agency, upon the identification of a violation of an environmental law and *upon a case-by-case basis, may utilize the criteria set forth in section 5 of P.L.1995, c. 296 (C. 13:1D–129) to designate that violation as a minor violation* and determine that the person responsible for that minor violation is eligible for the relief available under this act. In any such case, the department or local government agency, as the case may be, shall specify the time period which shall not exceed 180 days within which the responsible person shall correct the violation and achieve compliance. If compliance is achieved within that specified period, the department or local government agency shall not impose a penalty for the violation. If compliance is not achieved during that period due to a lack of required action by the department or a local government agency, then the compliance period shall be tolled until the department or local government agency takes such required action.

. . . .

*Within 180 days of the effective date of this act, the department, in accordance with the provisions of the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B–1 et seq.), shall promulgate rules and regulations to effectuate the purposes of this act.*

[*N.J.S.A.* 13:1D–131 to 33. Emphasis added.]

■ It is clear to us that the Legislature intended in the case of minor violations of the environmental laws that the DEP redirect its past reliance upon monetary penalties to prompt voluntary remediation of the violation in order to increase overall compliance

with the environmental laws, to more promptly ameliorate soil, water and air pollution and to minimize administrative costs and litigation expenses incident to the imposition of monetary penalties. To these ends and in light of the array of environmental laws which DEP is empowered to enforce, the Legislature required that regulations be adopted under the Grace Period Law on three subjects: (1) the purposes of the Law as generally described in the legislative preamble in order to implement those purposes; (2) the definition of "minor" (and thus necessarily also of "non-minor"), by "designating specific types or categories of violations within each regulatory and enforcement program of each environmental law"; and (3) "the period of time within which each type or category of minor violation shall be corrected and compliance achieved." Recognizing that it was, as a practical matter, impossible to define a generic "minor violation" that would cover all cases in the several technical and science/engineering-driven fields of soil, water and air pollution and contamination, the Legislature expressly permitted "case by case" determination for 180 days pending the adoption of regulations implementing the law. However, that "case by case" approach was specifically limited to the factors defining minor in the Grace Period Law.

As we have noted, the DEP has failed to adopt regulations in any of the three subjects in the eight years since the adoption of the Grace Period Law. Indeed, we read Barry's testimony before the ALJ as affirmative evidence of DEP resistance to the dictates of the Grace Period Law definition of "minor" by its continued adherence (1) to *N.J.A.C.* 7:26G–2.5(f), (g), (h) and (i) when those regulations utterly fail to reflect the terms of the Law; and, (2) to a classification system for violations devised in mid–1980s, which uses vague expressions such as "high priority" and "foreseeable" under which it appears there are no "minor" violations except those which may be beyond a violator's control or which involve discrepancies in paperwork. In short, what we perceive is that the DEP, for the last eight years, has not, in fact, been proceeding on a "case by case" basis under the Grace Period Law as directed

by the Legislature, but has proceeded upon an old regulatory framework and self-developed practices to assess monetary penalties which at worst violate the Grace Period Law and at best ignore its terms.

## III

In view of the DEP's eight-year failure to adopt regulations which implement the Grace Period Law[1], we have considered whether in light of the parameters defining a "minor" violation under that Law, *N.J.S.A.* 13:1D–129b, *supra*, pages 624–25, 845 A.2d at 154–55, Marisol's violations qualified for relief from monetary penalties. We conclude that the evidence of record does not support either the ALJ's or the Commissioner's conclusion that the Law does not apply. We conclude that it does apply and that DEP failed to prove that Marisol's violations were not minor.

We note initially that there was no evidence that Marisol had been identified in an enforcement action within the twelve months prior to December 16, 1999 respecting a similar violation. *N.J.S.A.* 13:1D–129b(5)(a). Nor did the evidence identify Marisol as responsible for the same or substantially similar violations at any time so as to reasonably indicate a pattern of illegal conduct. *N.J.S.A.* 13:1D–129b(5)(d). Finally, there was no evidence that either of its violations were the subject of mandatory assessment of civil administrative penalties under *N.J.S.A.* 58:10A–10.1. *N.J.S.A.* 13:1D–129c.

We agree with the ALJ's brief summary of § 129b(1)–(4) that "minor violations that can be corrected within a specified time should not result in a penalty assessment, if the violation is not purposeful, if it poses minimal risk to the public health, safety and

---

[1] In a post-argument letter, the Deputy Attorney General advised us that pursuant to a consent order entered in an unrelated case dated January 27, 2004, the State has agreed to promulgate Grace Period Regulations within one year for the Hazardous Waste Program.

natural resources, and if it does not materially and substantially undermine or impair the goals of the regulatory program." *Supra*, page 622, 845 *A*.2d at 153. We, nevertheless, are constrained to conclude that his ruling and that of the Commissioner that Marisol's violations created more than a minimal risk to the public health and safety, failed to adhere to the statutory criteria, failed to evaluate the evidence in light of those criteria, were highly conclusory, failed to weigh material and undisputed contrary evidence and rested on a presumption that all labeling violations of hazardous waste were per se non-minor. The rulings thus lack support in the record and fail to effectuate the underlying policy of the Law as expressed in its preamble.

The record demonstrates that Marisol's conduct was not purposeful or criminally negligent and that there were no reports of a similar violation within the twelve months prior to December 16, 1999. *N.J.S.A.* 13:1D–129b(1) and (4). The violations were corrected virtually on the spot. *N.J.S.A.* 13:1D–131. Nevertheless, the ALJ, relying on Barry's testimony, held that the violations were " 'high priority' warranting a penalty." But that self-justifying conclusion rests upon a standard not found in the Law and was only given content by Barry's reliance upon out-dated regulations and old DEP practices developed prior to the passage of the Law.

As to the matter of public health and safety, the ALJ found that "inspectors, emergency responders and anyone else who needs to deal with a drum or container of hazardous waste must know what the material is." That proposition rests on the premise that aisle visibility of the drum labels is a component of a proper emergency response. There was no expert or lay evidence that emergency response is an aim of in-storage labeling. Even if it is, the five random drums pulled from the stacks all bore an "S" code label, the material in them was promptly identified and end-of-row drums bore labels as to what was in each row. There was no lack of information as to what was in the drums and no evidence that Marisol was stacking drums together containing dangerously in-

compatible materials. The finding also ignored undisputed evidence that local emergency responders had agreed upon a protocol in which responders obtain information at the Marisol office about the nature of the material involved in any emergency.

We conclude that "S" code labeling of drums in storage and the roll-off has much more to do with the ability of Marisol to track the waste in the drums for its own internal recycling processes, to insure co-mingling of compatible wastes and to identify them for shipment off site. "Cradle to grave" tracking is, indeed, a significant goal of the regulatory program. Even for such purposes, however, while aisle visibility of labels eases inspection and, in that sense, aids tracking, if the labels are actually affixed to the drums, the ultimate risk to effective tracking, loss or misuse is minimal.

With regard to Marisol's failure to label a roll-off, the ALJ's and Commissioner's opinions fail to consider or evaluate all the evidence in determining whether the violation was minor under the Law. Once again the standards of the Grace Period Law were not followed. The opinions failed to identify what the threat to safety or health was or what goal of the regulatory program was prejudiced by the labeling violation. They did not evaluate the degree of risk to either resulting from the violation. Marisol demonstrated during the inspection that its routine record-keeping disclosed the wastes which were co-mingled in the roll-off. In fact, Marisol, under its modified license, was permitted shipments of waste in roll-offs, tankwagons and railroad cars which are placarded and covered by manifests that identify their contents for the purpose of transport in interstate commerce. Much of the time such containers remain empty on Marisol's premises. The conclusion that the violation was non-minor is, therefore, unsupported in the record.

Underlying the decision of both the ALJ and the Commissioner was the premise that more than minimal risk to the public health and safety or to natural resources arises simply because the waste involved was hazardous and that failure of labeling and labeling visibility inherently prejudices public health and safety and cradle

to grave tracking. Under that premise, no labeling violation could be minor. The Grace Period Law however, rests on the premise that the material subject to regulation is hazardous and, yet, its central purpose is to "fast track" remediation of minor violations rather than to impose monetary penalties. In this case, the Commissioner lost sight of that aim.

We, therefore, vacate the monetary assessments in this case. The penalties violate the Grace Period Law because Marisol remediated its violations immediately and DEP did not prove that those violations failed to qualify under the Law's criteria as minor violations.

Reversed and remanded to DEP for the entry of an order vacating monetary penalties.